911 So.2d 1160 (2005)
Scott MANSFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1352.
Supreme Court of Florida.
July 7, 2005.
Rehearing Denied September 15, 2005.
*1164 Bill Jennings, Capital Collateral Regional Counsel, Eric Pinkard, David R. Gemmer, and James L. Driscoll, Jr., Assistant CCRC's Middle Region, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Scott Mansfield appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's order denying Mansfield's rule 3.851 motion, and we deny Mansfield's petition for a writ of habeas corpus.

FACTS
Scott Mansfield was convicted of first-degree murder. The trial court sentenced him to death. The facts as described by this Court in its decision on Mansfield's direct appeal are as follows:
On the morning of October 15, 1995, the body of Sara Robles was found lying in a grassy area next to a Winn-Dixie grocery store in Kissimmee, Florida. Robles was lying on her back with her legs and arms outstretched. Her shirt and skirt were pushed up partially revealing her breasts and pelvic area which were mutilated.

*1165 Examination revealed that Robles' nipples had been excised, as well as portions of her labia minor, majora and clitoris.
The police recovered from the scene a Winn-Dixie bag with a receipt inside, and another receipt reflecting the purchase of some groceries which were found scattered near Robles' body. Robles was found wearing a watch, apparently broken during the murder, which was cracked and stalled at 3 a.m. Additionally, among the items recovered strewn around her body were food stamps and a pager.
The ensuing investigation revealed that the receipts found near Robles' body reflected purchases made roughly at 2:35 and 2:36 a.m. The police then questioned Jesus Alfonso, a friend of Robles, who visited with Robles the previous evening. Alfonso told police that he and Robles went to Rosie's Pub, located in the same shopping plaza as the Winn-Dixie. Alfonso left the bar at 1:30 a.m., but Robles remained at the bar playing pool with a male whose description matched Mansfield's.
Karen Hill, a bartender at Rosie's Pub, was then interviewed and indicated that Robles was at the bar the previous evening in the company of Mansfield. According to Hill, Mansfield, Robles, and a third individual by the name of William Finneran exited the bar together shortly after 2 a.m.
After speaking with other witnesses confirming that Robles was in the company of Mansfield and Finneran during the early morning hours of October 15, the police questioned Finneran who indicated that he had exited the bar with Mansfield and Robles shortly after 2 a.m. and that he last saw them around 3 a.m. at Winn-Dixie.
The police, after learning that the pager found at the murder scene was traced to Mansfield, focused their investigation on him. Additionally, the police interviewed Juanita Roberson, a Winn-Dixie night clerk, who indicated that Robles purchased the items reflected in the recovered receipts with a man whose description matched Mansfield's and that Robles was in the company of that same man outside the Winn-Dixie when Roberson took her break at approximately 3 a.m. the night of the murder. With this information in hand, three detectives went to Mansfield's residence the night following the murder to question him. Mansfield agreed to be interviewed by the detectives at the police station.
Prior to being transported to the station, the detectives noticed that Mansfield had fresh scratches on his knees and hands. Once at the station, he avoided and inconsistently answered many of the questions posed to him during the roughly two-and-a-half hour videotaped session. Specifically, Mansfield admitted to being at Rosie's Pub with Robles, but initially insisted that he had gone directly home after leaving the bar. Following further questioning, he begrudgingly admitted going to Winn-Dixie after leaving Rosie's Pub.
Shortly before the interrogation ended, the police received further evidence placing Mansfield at the scene of the crime. Juanita Roberson, the Winn-Dixie night clerk, identified Mansfield in a photograph lineup at the police station as the man she saw with Robles outside the Winn-Dixie the previous evening at approximately 3 a.m. The detectives directed Mansfield to lift his shirt at which time they observed a bruise on his chest. The police then arrested Mansfield and took into evidence a ring he was wearing with a distinctive "grim reaper" design.

*1166 The following day, Mansfield's brother, Charles, called the police and asked them to come down to his apartment to gather some items found in Mansfield's room. Once there, the police recovered food stamps, a knife and sheath, clothing, and a towel. [n. 3]
[n. 3] During its case in chief, the State's senior crime lab analyst, David Baer, testified as to the results of DNA and blood testing done on the items recovered from Mansfield's room. His testimony established that some of the items had blood that was consistent with Mansfield's. The tests conducted on the items recovered from Mansfield's room, however, did not reveal the presence of Robles' blood.
While at the apartment the police also questioned Mansfield's 10-year-old niece, Melissa Mansfield, who told them that Mansfield arrived home on the morning of October 15 at about 4:30. Melissa told police that Mansfield came to the door soaking wet, wearing shorts but no shirt, and carrying his shoes. Melissa told police she gave Mansfield a towel at his request, and that she noticed what appeared to be a small blood stain on his shorts.[n. 4]
[n. 4] During Mansfield's interrogation with police the previous evening, Mansfield told police that he had taken a swim in the pool in the early morning hours of October 15 before entering the apartment and that his niece saw him enter the apartment afterwards.
The State introduced several other witnesses at trial who placed Mansfield with Robles at or near the crime scene at approximately the time the murder was presumed to have occurred. The State's medical examiner, Dr. Julie Martin, testified as to the existence of a pattern injury on the neck of Robles consistent with the pattern found on the "grim reaper" ring removed from Mansfield following his arrest.
Dr. Martin testified that Robles died of asphyxia due to airway compression as a result of blunt force trauma to the neck. Specifically, Dr. Martin opined that the murderer, while straddling Robles, strangled her with one hand, using the other hand or an object (the ring) to press down on her lower neck, causing her trachea to collapse. She further testified as to the existence of extensive bruising about Robles' eye, neck and collarbone. Dr. Martin concluded that Robles was conscious and struggling to breathe for "more than a few minutes" before becoming unconscious. According to Dr. Martin, Robles was alive but most likely unconscious when parts of her genitalia were excised by a sharp object consistent with the knife recovered from Mansfield's room.
The State also introduced the testimony of convicted felon Michael Derrick Johns who recounted a jailhouse conversation with Mansfield in which Mansfield confessed to Robles' murder. The defense did not present any evidence.
Mansfield v. State, 758 So.2d 636, 640-642 (Fla.2000) (some footnotes omitted).
The jury convicted Mansfield of first-degree murder and unanimously recommended a death sentence. The trial court, Judge Belvin Perry presiding, followed the jury's recommendation, finding two aggravating factors[1] and five nonstatutory mitigating factors.[2]State v. Mansfield, No. *1167 CR95-2078 (Fla. 9th Cir. Ct. order filed Jan. 30, 1998). Mansfield appealed to this Court, raising ten issues.[3] This Court affirmed Mansfield's conviction and sentence. While we held that the statements Mansfield made to detectives should have been suppressed because he was in custody but had not received Miranda[4] warnings, we concluded that the error was harmless. We denied Mansfield's remaining claims. The United States Supreme Court thereafter denied Mansfield's petition for writ of certiorari. Mansfield v. Florida, 532 U.S. 998, 121 S.Ct. 1663, 149 L.Ed.2d 644 (2001).
On June 5, 2001, Mansfield filed a "shell" rule 3.850 motion for postconviction relief which the postconviction court dismissed because the motion contained no supporting facts and only made conclusory allegations. State v. Mansfield, No. CR95-2078 (Fla. 9th Cir. Ct. order filed Sept. 6, 2001). Mansfield then filed an amended motion for postconviction relief, raising sixteen claims.[5] The postconviction *1168 court granted an evidentiary hearing on all claims. Following the evidentiary hearing, the court entered a final order denying all relief. State v. Mansfield, No. CR95-2078 (Fla. 9th Cir. Ct. order filed June 30, 2003) (Postconviction Order). Mansfield now appeals the postconviction court's denial of his rule 3.851 motion. He also petitions this Court for a writ of habeas corpus.

RULE 3.851 APPEAL
Mansfield's rule 3.851 appeal asserts that (1) the postconviction judge should have been disqualified; (2) his trial counsel was ineffective; (3) the State presented false or misleading evidence in violation of Giglio; and (4) cumulative error denied Mansfield a fair trial.[6]

Issue 1: Disqualification of Trial and Postconviction Judge
Mansfield claims that the judge in the postconviction proceeding, who also served as the trial judge, should have been disqualified at the postconviction hearing and also makes a related claim that his trial counsel was ineffective during the trial's penalty phase for failing to move to disqualify the trial judge. The basis for these related claims is a statement which the trial judge made on the record to counsel, outside the presence of the jury, during the penalty phase deliberations. The statement was made when the trial judge was told by Mansfield's attorney that the State had made a plea offer to Mansfield of a sentence of life in prison without the possibility of parole if Mansfield would admit his guilt and waive all rights to appeal. Although Mansfield refused the offer at first, his defense counsel attempted to convince him to accept it and then told the judge about the offer. After learning of the proposed plea offer, the judge made the following comments.
Now, I find it troubling, to say the least, and I'm going to tell you why. Probably one of the most serious cases that I know of is a case involving murder in the first degree where the State seeks the ultimate sanction. I can knowI do not know of any more serious crime or where the consequences are so severe.
Judges are taught through their judicial schools that death is different. We are taught that these proceedings are to be conducted differently. We are taught that we must be ever mindful of the procedure, the safeguards afforded to people who are accused of crimes. We are also taught of the gravity involved in a decision.
When the State of Florida seeks the ultimate sanction, I was under the impression, maybe wrongfully so, that the State of Florida looked at a case, they looked at whether or not they could prove it and made any determinations of whether or not there would be any proof problems. They looked at something that the Florida Supreme Court looks at which is called proportionality. And they would also be ever mindful of the critics who, up until today's date, I have always felt very comfortable when I would be approached by people in the community concerning the death penalty and how the death penalty was not equally applied, particularly when it dealt with people of ebony hue, people of color and people who were victims who were of color.
And I have always taken the tack that we were very fortunate here in the Ninth Circuit that we had an outstanding *1169 State Attorney's Office that basically looked at the case and did an analogy that was colorless. And Iand that did not have any happenstance to it.
I think that when you announced, unless something changes drastically in this caseand I've thought about it. I presided over this case. And at this time and point, I do not see any errors. And if there are any errors, I don't see any reversible errors. So I don't see any proof problems. What really concerns me is why would this Court and this jury be asked to consider the ultimate sanction in this particular case, and then at the ninth hour, it just suddenly goes away?
This is an emotional drain on the victim's family. It's an emotional drain on Mr. Mansfield's family to come in here to testify, to have to bare their souls as to what occurred during their childhood and to perhaps expose family secrets that they would not otherwise expose. And we get to this particular stage which really makes me question the sincerity of the state in seeking the ultimate sanction.
As I indicated to all of you, this is very, very serious business. You're asking 12 folks over there to consider sending this man to Florida's electric chair. And if they make a recommendation of death, then you're asking this court to consider looking at Mr. Mansfield and telling Mr. Mansfield he needs to die in Florida's electric chair. And besides what I call minor issues, and these are minor issues, the extra expense to the taxpayers because we had to hire two lawyers because it was a death case. If it wasn't a death case, we wouldn't be paying two lawyers. We would not need to be back here today. The disruptions in the lives of these jurors, who God only knows whether or not all of them had a good night's sleep knowing that they would have to come in here and decide whether or not they should recommend that this man die.
Either a person meets the criteria to die in Florida's electric chair, and if the proof is there, we need to put them there. If the person does not meet the criteria, then so be it. And that's why we have all of these arguments now back and forth about the death penalty, because people claim that it is willy-nilly applied and that there is no rhyme or basis as to who gets it and who does not get it.
If folks are going to have confidence in our system of justice, then they are going to have to know that we're going to evenly apply it to everyone. If you meet the criteria and you don't have any proof problems, then so be it, then you go to the electric chair. If there are no proof problems and the State of Florida can prove their case, thenthen the ultimate sanction can be imposed. Then we will not have the naysayers who constantly, constantly point outand one justice on the United States Supreme Court got so frustrated thatwho used to be a big supporter of capital punishment and said the he wasn't going to support it any more because it could not be evenly applied because there was no rhyme or reason.
So what is it that the State of Florida wants in this case? Because he has been found guilty by a jury. He has been adjudged to be guilty and fingerprinted here in open court. Now, that stands.
Now, are you saying that in exchange for waiving the death penalty, you want him to give up his, quote, appellate rights? And I'll be honest with you, I don't know how valid that is, but ...

*1170 What is it the State of Florida wants? I am just confused.
Based upon these comments, Mansfield argues that Judge Perry should not have further presided in this case. However, Mansfield did not file a motion to disqualify Judge Perry within the required time following Judge Perry's statements.[7] Mansfield seeks to overcome this procedural bar on two bases. The first basis is his claim that his trial counsel was ineffective for failing to timely move to disqualify Judge Perry. The second basis is that the statement was a basis for the disqualification of Judge Perry as the postconviction judge, and the filing of the motion to disqualify Judge Perry as the postconviction judge did not have to be filed until Mansfield knew that Judge Perry was going to be the postconviction judge.
Since whether either of these two bases avoids the procedural bar becomes immaterial if we determine that Judge Perry's statement did not disqualify him from continuing as the trial judge in the penalty phase of the trial and in postconviction, we make that determination first.[8] The standard of review of a trial judge's determination on a motion to disqualify is de novo. Chamberlain v. State, 881 So.2d 1087, 1097 (Fla.2004), cert. denied, ___ U.S. ___, 125 S.Ct. 1669, 161 L.Ed.2d 495 (2005). Whether the motion is legally sufficient is a question of law. Barnhill v. State, 834 So.2d 836, 843 (Fla.2002).
In his order denying the motion to disqualify, the trial judge found that Mansfield's motion was legally insufficient. The order stated:
The standard for viewing the legal sufficiency of a motion to disqualify is whether the facts alleged, which must be assumed to be true, would cause the movant to have a well-founded fear that he or she will not receive a fair trial at the hands of that judge. See Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983). See also Fla. R. Jud. Admin. 2.160(d)(1).
State v. Mansfield, No. CR95-2078 (Fla. 9th Cir. Ct. order filed June 17, 2002). This is the correct standard for determining this motion.
In this appeal, Mansfield does not explain the basis for Judge Perry's comments causing a well-founded fear that he would not receive a fair trial. Mansfield only cites to Royal Caribbean Cruises, Ltd. v. Doe, 767 So.2d 626, 627 (Fla. 3d DCA 2000). This was a case which involved comments by a trial judge concerning his personal views of the responsibilities of cruise lines in a case in which a cruise line was a defendant. We find the judge's comments in that case to be distinguishable from the statement by Judge Perry here.
We read Judge Perry's statement to be a statement concerning the timing of a plea offer. We find nothing in the statement that indicated bias or prejudice against Mansfieldrather, the statement was plainly directed at the State. The statement in respect to reversible errors was a statement of the trial judge's opinion *1171 while part of the trial was still ongoing. We do not read the statement as indicating any bias or any predisposition concerning future rulings.
Based upon our case law, we find no basis to reverse the trial judge's denial of the motion to disqualify. We conclude that the motion failed to provide a basis for disqualification of the trial judge on the ground that Mansfield had a well-founded fear that he would not receive a fair trial. In Jackson v. State, 599 So.2d 103, 107 (Fla.1992), the allegation was that the trial judge's comments "seem to infer a predisposition by [the judge] as to the facts that are expected to be presented at his new trial." We said:
A motion to disqualify must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy. See Gilliam v. State, 582 So.2d 610, 611 (Fla.1991); Dragovich v. State, 492 So.2d 350, 352 (Fla.1986). The fact that a judge has previously made adverse rulings is not an adequate ground for recusal. Gilliam, 582 So.2d at 611; Suarez v. State, 95 Fla. 42, 115 So. 519 (1928). Nor is the mere fact that a judge has previously heard the evidence a legally sufficient basis for recusal. Dragovich, 492 So.2d at 352.
Id. Likewise, we recently pointed out that a "mere `subjective fear[ ]' of bias will not be legally sufficient, rather, the fear must be objectively reasonable." Arbelaez v. State, 898 So.2d 25, 41 (Fla.2005) (quoting Fischer v. Knuck, 497 So.2d 240, 242 (Fla.1986)). We do not find Mansfield's allegations of fear to be objectively reasonable. See also Asay v. State, 769 So.2d 974 (Fla.2000). Our cases support the trial court's denial of the motion to disqualify, and we affirm the trial judge's order.
Thus, the other claims which are based upon the trial judge's statements are denied as moot.

Issue 2: Ineffective Assistance of Counsel
Mansfield raises several claims of ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. Second, the defendant must show that counsel's deficiency prejudiced the defendant, which occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. Under Strickland, whether counsel was ineffective and whether there was prejudice are mixed questions of law and fact. The legal issues are subject to a de novo standard of review, and the trial court's determination of the historical facts are given deference as long as they are supported by competent, substantial evidence. Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
Mansfield first claims that he was denied effective assistance of trial counsel because of counsel's failure to adequately question eight prospective jurors.[9] These *1172 eight jurors, according to Mansfield, revealed potential biases in their responses to the juror questionnaires that were not adequately addressed by trial counsel, and thus Mansfield may have been denied an impartial jury. The postconviction court denied this claim, stating that it was "speculative in that it assume[d] different jurors would have come to a different conclusion, but offers no support for that proposition." Postconviction Order at 15.
During voir dire, counsel must question prospective jurors so that counsel can reasonably conclude that "the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." Spencer v. State, 842 So.2d 52, 68 (Fla.2003).
The trial record reveals that the trial court, the State, and defense counsel engaged in substantial questioning of the potential jurors. Michael Irwin, codefense counsel for Mansfield, utilized the juror questionnaires throughout voir dire. He asked jurors about contradictory answers in their questionnaires. During the postconviction evidentiary hearing, Mansfield's trial counsel were questioned about jury selection. Counsel were not asked about specific jurors and why questions were or were not asked of specific jurors. However, defense counsel testified at the hearing that they struck the least desirable jurors. Defense counsel Kathleen Flammia testified at the postconviction evidentiary hearing that in this process, she generally employed a strategy during voir dire selection wherein she prioritized which jurors to strike. Trial counsel used all ten of their peremptory challenges. Trial counsel consulted with Mansfield, who gave his own input as to the jurors. Mansfield has not pointed to any instances in which the record demonstrates that counsel did not conduct the voir dire in accord with reasonable professional norms. Our review of the record indicates in the voir dire in this case that trial counsel and the trial court sufficiently questioned the prospective jurors so that it could reasonably be determined that the jurors who were jurors in the trial could lay aside bias and prejudice and render a verdict solely on the evidence and instructions. We find no error in the trial court's denial of this claim. Griffin v. State, 866 So.2d 1, 12-13 (Fla.2003) (rejecting postconviction claim of ineffective assistance of counsel for failure to adequately question jurors in their personal views toward death penalty and mitigation when record established both defense counsel and prosecutor questioned members about their views and eight venire members were excused because of strong opinions about the death penalty).
Mansfield next asserts that defense counsel should have established at trial that the crime scene was not adequately diagrammed, and so the exact location of his pager in relation to the body was unknown. We find no basis in the record for disagreeing with the trial court's denial of this claim because there was no demonstration that trial counsel was ineffective. Defense counsel Flammia stated to the jury in her opening statement that there was no forensic evidence linking the pager to the crime scene and that the evidence would show that the pager was where Mansfield had been seen urinating. See Freeman v. State, 761 So.2d 1055, 1063 (Fla.2000) (finding defense counsel not ineffective when counsel did argue at trial that crime scene was not properly investigated). Additionally, at the postconviction evidentiary hearing, Bob Creager, a crime scene technician with the Kissimmee Police Department (KPD), stated that he did record where various evidence was located at the scene and recalled doing measurements, though the information as to exact *1173 distances was not in the postconviction evidence. All of the law enforcement officers who testified at the hearing remembered the pager being within twenty feet of the body. Mansfield offered no evidence to support his postconviction contention that the pager was not in the same area as the body. Also, Mansfield has failed to demonstrate what prejudice would have resulted had the jury known that there was no diagram of the crime scene. Given the evidence against Mansfield, we find no error in the trial court's denial of postconviction relief in that there was not a reasonable probability that a diagram would have brought about a different result in this case. Our confidence in the outcome is not undermined. Thus, we affirm the postconviction court's order denying relief on this issue.
Mansfield next argues that his trial counsel was ineffective in respect to the investigation of William Finneran in not developing evidence that Finneran was the actual murderer. Finneran was seen with Mansfield and Robles after the three left Rosie's Pub, and Mansfield asserts that more evidence indicates Finneran was the actual perpetrator than was revealed at the trial. Mansfield asserts that defense counsel should have cross-examined Finneran about his statement that the victim had scraped his arm and elicited from the Florida Department of Law Enforcement (FDLE) DNA expert that no DNA tests had been performed on the samples taken from Finneran. The postconviction court pointed out, however, that Mansfield never sought to have Finneran's DNA tested for purposes of the postconviction proceedings. The postconviction court denied this claim, stating that Mansfield failed to assert what evidence would have made the jury find Finneran more likely to have committed the murder.
Mansfield further claims that trial counsel should have either rebutted Finneran's statement that he made a collect call to Charles Sturtevant, an acquaintance of Finneran's who had been at Rosie's Pub earlier that night, closer to 2:45 or 3 a.m., as opposed to 3:15 a.m., or should have highlighted the discrepancy in the defense's closing statement. This collect call was made from a payphone near the location where Robles' body was discovered. Mansfield claims that this distinction is important because Robles was killed around 3 a.m., and the collect call placed Finneran close to the murder scene soon after the killing. During the cross-examination of Finneran, he stated that he thought the time he made the collect call was around 2:45 or 3 a.m. but that he did not have a watch on and was not "clock-watching." However, the record reflects that Officer Ronald Schroeder of KPD had just testified that the call was placed at 3:15 a.m. and that when the State recalled Officer Schroeder following Finneran's testimony, defense counsel again elicited that the call was placed at 3:15 a.m. Thus, this fact and the discrepancy in Finneran's testimony as to the time were highlighted by the defense both before and after Finneran's testimony.
Mansfield next argues that trial counsel was ineffective for not impeaching Finneran with his phone records because they show that he did not make any calls to Denmark until 3:47 a.m., and so he did not have an alibi for the time of the murder. But the trial record shows that Finneran never used the calling of his girlfriend in Denmark as an alibi. He stated that he was at the Farm Store making the collect call to Sturtevant around 3 a.m. and then tried hitchhiking to find a ride home. He stated that he called his girlfriend in Denmark later that morning. Thus, it was unnecessary for trial counsel to impeach *1174 Finneran with the phone records because it was clear from the testimony at trial that he was in the vicinity of the crime scene at the time the killing occurred.
We thus find no error in the trial court's denial of the postconviction claims concerning Finneran.
Mansfield next argues that trial counsel was ineffective in the cross-examination of Christopher Randall because it was not elicited that Randall had federal charges pending against him.[10] The postconviction court denied this claim, finding that Mansfield had failed to establish how the outcome would have been different at trial had Randall's full record of charges been known. The postconviction court also found that Randall's extensive criminal record was presented to the jury and that trial counsel also elicited the fact that he had testified against numerous prisoners in the past. In view of this thorough examination of Randall's criminal record, we do not find error in the determination that the lack of more information about Randall's federal record did not prejudice Mansfield, and our confidence in the outcome is not undermined in view of this thorough examination of Randall's criminal record.
Mansfield next claims that trial counsel was ineffective because of the brevity of her closing argument. The postconviction court found that the brief initial closing argument by trial counsel was a part of her strategy, and she was prevented from a second opportunity for closing argument because the State did not make a closing argument. In her brief remarks, trial counsel told the jury that there was not enough evidence to erase the reasonable doubt that Mansfield killed Robles, particularly given that the two star witnesses, Finneran and Randall, had much to gain by testifying. It is clear from the trial record that counsel expected to deliver a final closing argument following the State's closing argument because she stated that after the State's closing argument, she would "have another chance" to address the jury. This did not work out as trial counsel planned because the State did not make a closing argument, and this foreclosed defense counsel from giving a rebuttal argument.
As the postconviction court pointed out, an attorney is not ineffective for decisions that are a part of a trial strategy that, in hindsight, did not work out to the defendant's advantage. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Even a waiver of closing argument does not necessarily constitute ineffective assistance of counsel. See Bell v. Cone, 535 U.S. 685, 701, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). We affirm the finding of the postconviction court and deny this claim for ineffective assistance of counsel. We do not conclude that it was a breach of a reasonable professional norm in this case for trial counsel to have planned to make a substantive rebuttal argument after the State closed. Nor do we find that the defendant was prejudiced by trial counsel not giving the rebuttal argument.
Finally, Mansfield claims that trial counsel was ineffective for failing to move to suppress the introduction into evidence of his ring and the photographs taken of his torso following his interrogation. We affirm the postconviction court's denial of *1175 this claim because we agree with the postconviction court that it was not ineffective assistance of counsel for trial counsel not to move for the suppression of the ring and the photographs. Underlying Mansfield's claims is the assertion that the police lacked probable cause to arrest Mansfield, that the arrest was the fruit of the improper interrogation of Mansfield, and therefore any items seized or photographs taken were the fruits of an improper arrest and should not have been admitted. Any claim that Mansfield's arrest was without probable cause should have been raised on direct appeal. On direct appeal, we did not find that there was a lack of probable cause for Mansfield's arrest; rather, we held on direct appeal that Mansfield was in custody during his interrogation and that any statements he made should have been suppressed. Mansfield, 758 So.2d at 644. We then found that the failure to suppress these statements was harmless given that the statements Mansfield made were not the centerpiece of the case against him. Id. The ring was taken by police after Mansfield's arrest, and it was placed with Mansfield's personal items, consistent with normal procedures of the Osceola County Jail. There was no illegal seizure in doing this. Lightbourne v. State, 438 So.2d 380 (Fla.1983).
Similarly, Mansfield's claim that trial counsel should have moved for the suppression of photographs taken of his torso following his interrogation is without merit. The interrogating officers saw injuries in plain view on Mansfield's knees and hands and then asked him to lift his shirt. The officers then took photos of the bruises and other injuries on Mansfield's torso. Mansfield argues that these photos should have been suppressed because they were fruits of an illegal interrogation. This Court previously considered whether photographs taken in response to a confession obtained in violation of Miranda should have been suppressed. Jennings v. State, 512 So.2d 169, 171 (Fla.1987). There, we stated:
Assuming without deciding that the poisonous tree doctrine applies to physical evidence obtained as a consequence of a voluntary confession elicited in violation of the prophylactic rules of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, we agree that the photographing of appellant's genitalia would have been accomplished irrespective of his confession. See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Appellant became one of many suspects early in the investigation, due in part to his having been accused as a juvenile of burglary and in part because his physical description matched that of an unknown man who had been seen in the victim's neighborhood around the time of her abduction. Further investigation showed that appellant's shoes matched footprints found at the victim's house, his fingerprints were found at the house, and he had returned home on the night of the murder with his clothes and hair wet (the victim's body had been found in a canal). The police had probable cause to arrest the defendant without the confession, and the photographs would have been inevitably obtained.
Id. at 171-72 (footnote omitted). Similarly, in this case, the photographs were taken incident to a lawful arrest, and counsel was not ineffective for not moving to suppress the photographs.
We therefore find no error in the postconviction court's denial of the ineffective assistance of counsel claims and affirm the denial of these claims.

Issue 3: Giglio Claim
Mansfield asserts that the testimony given at trial by Michael Derrick *1176 Johns, also known as Christopher Scott Randall (Randall), was false testimony in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). A Giglio violation is established when it is shown that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Guzman v. State, 868 So.2d 498, 505 (Fla.2003). A statement is material if "there is any reasonable likelihood that the false testimony could have affected" the jury's decision. Id. at 507.
At trial, Randall testified that while he was sharing a holding cell with Mansfield at the Osceola County Courthouse, Mansfield confessed to killing Robles. According to Randall, Mansfield described the details of the murder and then told him that he went swimming after the murder so that the chlorine would eliminate any evidence on him. Randall testified that no deals or promises had been made in exchange for his testimony, although he was awaiting sentencing and believed that the trial judge knew that he was testifying on behalf of the State in Mansfield's case. Randall stated that he was awaiting sentencing after pleading guilty in Osceola County, and when asked whether he had charges for which he was being prosecuted outside of Osceola County, he stated that he did not know what was happening with other charges he had in Pinellas County. He also later stated that he had no pending trials.
On cross-examination, Randall admitted that prior to Mansfield's trial, he had been an informant in other federal and state cases. Defense counsel also elicited that Randall had used other names and had lied to officers about his birthdate during prior arrests. Randall testified that he had been convicted of five felony counts in the federal system and that he received a lighter sentence after he testified against another federal prisoner. Randall also stated that he left the halfway house where he lived following his federal sentence. He told the jury that he was still awaiting sentencing on the state charges to which he had pled guilty but that he was testifying at Mansfield's trial because he wanted to "give a little something back" and not to gain any benefit for himself. During this cross-examination, defense counsel also exposed many instances where Randall's testimony conflicted with responses he gave during his deposition.
Mansfield's claim is that Randall gave false testimony because, when asked whether he had any other pending charges, he failed to tell the jury that he had been indicted for an additional eleven federal charges on March 1, 1996. The record reflects that Randall was not arrested pursuant to this indictment until after Mansfield's trial.
Randall was in jail at the time that Mansfield allegedly made the incriminating statements to him because he had pled guilty to state charges of robbery, attempted robbery, escape, and battery in Osceola County. While awaiting sentencing for these convictions, on March 26, 1997, Randall requested information from the Osceola County Sheriff's Office about any pending holds on potential federal charges, and the response he received stated: "[A]t this time I have: USMO, Middle District ch: Escape, FDLETampa Ch. Robbery x2, FDLETampa Ch. G/T x2, USMOMiddle District Ch: Bank Robbery & Escape, Pinellas Co. Ch: G/T. That is what I have listed, there may be more?" Randall was arrested on the federal indictment on November 19, 1997, after he testified at Mansfield's trial on November 7. Mansfield asserts that the information on the pending holds that Randall received on March 26, 1997, proved that both he and the State knew about his additional pending *1177 federal charges and that Randall and the State failed to reveal this information to the jury.
Dorothy Sedgwick, an assistant state attorney for Osceola County, prosecuted Mansfield. At the postconviction hearing, she testified that she considered Randall's testimony as to Mansfield's confession truthful, but she thought the jury might discount it given his extensive criminal record. She also stated that she did not have a good understanding of what the federal charges against Randall were at the time of Mansfield's trial, although she and Mansfield's attorney had done extensive research in an effort to determine what charges Randall was facing. She stated that she gave Mansfield's defense counsel any information she had about charges pending against Randall. Sedgwick also stated that she had never negotiated a lower sentence on Randall's behalf. She did, however, speak to the prosecutor for the State in Randall's case six days after the Mansfield trial. This prosecutor subsequently agreed to sentence Randall at the lower end of the sentencing guidelines for his charges of robbery, attempted robbery, escape, and battery.
Kathleen Flammia, trial counsel for Mansfield, stated at the evidentiary hearing that if she had had any knowledge of Randall's federal charges at trial, she would have used that information to impeach him. She stated that she and the defense investigator performed research to determine whether Randall had federal charges, but they were unable to find any information. She also stated that she knew there was a federal hold on Randall's charges because he told her this at his deposition before trial, but she did not use that information to impeach him. She stated that knowing he had a federal hold placed on him was different than knowing about charges against him and that she was not sure how she would use the fact of his federal hold to impeach him. She stated that she had reviewed his Osceola County Jail file.
The only evidence Mansfield presented was that Randall and the State knew about his federal hold, but defense counsel Flammia testified that she also knew about a federal hold.[11] When asked if he had any other charges or was awaiting any other trials, there was no evidence presented that Randall was lying when he responded in the negative. Furthermore, there is no evidence that the State knew of the federal charges. We find that Mansfield has failed to meet the first two prongs of Giglio.
We also hold that Mansfield has not demonstrated a Giglio violation because he has failed to prove the third prong of materiality. While, as Mansfield points out, the materiality test under Giglio is more "defense friendly" than the materiality test in Brady,[12] these facts still fail to meet this standard. Guzman, 868 So.2d at 507. The jury was made aware of Randall's past federal convictions, his current state charges, the fact that he had escaped from a federal halfway house, and the numerous times Randall had informed on other fellow inmates. We find no error in the trial court's determination that extra *1178 charges pending against Randall would not have made Randall sufficiently less credible in the jury's eyes than he already was, and thus there is no reasonable likelihood that the jury would have found Mansfield not guilty had the jury known about these federal charges.
Mansfield also claims that Randall lied at the trial when he stated that he did not expect to receive any benefits for his testimony against Mansfield. Assistant State Attorney Sedgwick stated in her opening statement that Randall would tell the jury that no agreement existed, although Randall was hoping that his cooperation would affect his upcoming sentencing. Mansfield asserts that this statement and the fact that Sedgwick spoke to a prosecutor on Randall's behalf within a month of Mansfield's trial conflicted with Randall's testimony that he did not expect any benefit as the result of his testimony.
The postconviction court found there was no evidence that Randall was promised any benefit in exchange for his testimony. We do not find that the trial court's finding was error. We agree and affirm the postconviction court's denial of this claim.
We have considered each of the claims presented by Mansfield in respect to the denial of his rule 3.851 motion. We affirm the trial court's denial of the motion.

HABEAS PETITION
Mansfield's petition for a writ of habeas corpus asserts that (1) his appellate counsel was ineffective; (2) his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (3) Mansfield's death sentence is unconstitutional because he may become incompetent at the time of execution.[13]

Issue 1: Ineffective Assistance of Appellate Counsel
Appellate counsel is deemed ineffective when (1) "alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance"; and (2) "the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). Appellate counsel cannot be deemed ineffective for failing to raise a claim which "would in all probability" have been without merit or would have been procedurally barred on direct appeal. Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
Mansfield first claims that appellate counsel was ineffective for failing to challenge the jury instructions that allowed the jury to find him guilty of first-degree murder if he was found guilty of either felony or premeditated murder. This Court and the United States Supreme Court have repeatedly rejected relief on this issue. In Schad v. Arizona, 501 U.S. 624, 645, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), the Supreme Court held that the United States Constitution did not require the jury to come to a unanimous decision on the theory of first-degree murder and that separate verdict forms for felony and premeditated murder were not required. "It is well established that an indictment *1179 which charges premeditated murder permits the State to prosecute under both the premeditated and felony murder theories." Parker v. State, 904 So.2d 370 (Fla. 2005). Furthermore "[b]ecause the State has no obligation to charge felony murder in the indictment, it similarly has no obligation to give notice of the underlying felonies that it will rely upon to prove felony murder." Kearse v. State, 662 So.2d 677, 682 (Fla.1995). Mansfield's appellate counsel was not ineffective for failing to raise a claim which we have repeatedly rejected. Floyd v. State, 808 So.2d 175, 185 (Fla.2002). To the extent that Mansfield raises a substantive claim on this issue, this claim is without merit under this prior case law.
Mansfield also argues that the Supreme Court decisions in Ring and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), have changed the constitutional requirements for a death penalty jury. However, Mansfield fails to demonstrate how the holdings in Ring and Apprendi overruled the decision in Schad. Also, the Apprendi and Ring decisions were released after our decision on Mansfield's direct appeal, and appellate counsel is not required to anticipate changes in the law. Walton v. State, 847 So.2d 438, 445 (Fla.2003). Thus, this claim would not have had any merit on direct appeal.
Mansfield next claims that his appellate counsel was ineffective for failing to raise on direct appeal the issue of the judge's disqualification at trial following comments made by the judge concerning the State's plea offer. The relevant facts are stated above in Issue 1 under the 3.851 appeal section. This claim would have been procedurally barred on direct appeal because the issue was not preserved at trial for appellate review. Mansfield's trial counsel never moved for the trial judge's disqualification following the comments the judge made at trial. Thus, even if appellate counsel had presented this claim on direct appeal, it would have been denied as procedurally barred. See Archer v. State, 613 So.2d 446, 448 (Fla.1993) ("For an issue to be preserved for appeal, however, it `must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'") (quoting Tillman v. State, 471 So.2d 32, 35 (Fla.1985)).
Even had this claim been preserved for appeal, appellate counsel was not ineffective for failing to raise it. Appellate counsel cannot be deemed ineffective for failing to raise a claim which "would in all probability" have been without merit on direct appeal. Rutherford, 774 So.2d at 643 (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)). Appellate counsel's failure to raise this claim was not substantially deficient because the judge's comments did not indicate that he was biased against Mansfield or that he had predetermined the appropriate sentence to be given to Mansfield, as discussed above.
Also, Mansfield has failed to show that counsel's actions undermined confidence in the appellate process. Given that the judge's comments did not manifest a bias against Mansfield, this claim would not have succeeded on appellate review. Thus, we hold that appellate counsel was not ineffective.
We also deny Mansfield's claim that his appellate counsel was ineffective for failing to challenge the State's use at trial of the videotaped interrogation of Mansfield which included several comments that Mansfield argues should not have been presented to the jury. Mansfield argues that appellate counsel was ineffective for not challenging the admission of the videotape on the basis of these *1180 comments, which allowed the jury to hear impermissible character evidence, victim impact testimony, and false evidence. However, this claim would have been procedurally barred on direct appeal because the issue was not preserved at trial for appellate review. While trial counsel objected to the tape on the basis of Miranda, an objection on the basis of the content of the tape was not made. Thus, even if appellate counsel had presented this as a claim on direct appeal, it would have been denied as procedurally barred. Archer, 613 So.2d at 448.
We have already considered the admissibility of the tape to be harmless error because of the fact that the tape was not the centerpiece of the State's case against Mansfield. Mansfield, 758 So.2d at 645. Moreover, Mansfield does not raise any cognizable claim on the basis of these statements. None of the officers' statements were actual evidence against Mansfield. Nor was the tape presented at trial for the purpose of admitting victim impact or bad character evidence. The erroneous factual evidence Mansfield asserts was improperly introduced by this tape was corrected at trial. Thus, appellate counsel was not substantially deficient for failing to raise a claim on direct appeal that was without merit.

Issue 2: Ring and Caldwell Claims
Mansfield next argues that his sentence of death is unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We recently held that Ring is not retroactive. Johnson v. State, 904 So.2d 400 (Fla. 2005). Thus, Mansfield's claim is denied.
We have also repeatedly rejected objections based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), to Florida's standard jury instructions. See Sochor v. State, 619 So.2d 285, 291 (Fla.1993); Turner v. Dugger, 614 So.2d 1075, 1079 (Fla.1992). This claim is also denied.

CONCLUSION
Since Mansfield fails to raise an issue with any merit, we affirm the circuit court's order denying Mansfield's rule 3.851 motion, and we deny Mansfield's petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., dissents with an opinion.
ANSTEAD, J., dissenting.
I cannot concur in the majority's analysis and conclusion that the trial judge's strong adverse reaction to the State's willingness to agree to a life sentence would not raise a reasonable fear in the defendant's mind as to the fairness of the subsequent sentencing proceedings and postconviction proceedings. Cf. Suarez v. Dugger, 527 So.2d 190, 192 (Fla.1988) (comments of trial judge that "enough is enough" sufficient to warrant fear on part of defendant that further proceedings would not be fair). As in Suarez, where a judge expressed impatience with the process, we must remember that it is the effect of the trial judge's remarks on the defendant that must be considered. The remarks quoted in the majority opinion surely would give rise to a reasonable fear on the part of the defendant that a trial judge who was distressed with and obviously did not approve of the State's late offer of mercy could not thereafter treat the defendant fairly in the subsequent sentencing proceedings.
Hopefully, all would agree that the defendant was entitled to the appearance of a fair tribunal at every stage of his case. This Court has consistently emphasized *1181 the critical and fundamental importance of an impartial and unbiased judge. Recently, we emphasized this concern in our opinion in In re McMillan, 797 So.2d 560 (Fla.2001):
The promise of "Equal Justice Under Law" is essentially predicated upon an independent judiciary committed to fairness and justice in the application of the law to the individual case. In Rose v. State, 601 So.2d 1181 (Fla.1992), we reaffirmed this long established and oft-repeated principle in our jurisprudence:
The impartiality of the trial judge must be beyond question. In the words of Chief Justice Terrell:
This Court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an impartial judge.... The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.
... The attitude of the judge and the atmosphere of the court room should indeed be such that no matter what charge is lodged against a litigant or what cause he is called on to litigate, he can approach the bar with every assurance that he is in a forum where the judicial ermine is everything that it typifies, purity and justice. The guaranty of a fair and impartial trial can mean nothing less than this.

State ex rel. Davis v. Parks, 141 Fla. 516, 519-520, 194 So. 613, 615 (1939).

Id. at 1183. Accordingly, no other principle is more essential to the fair administration of justice than the impartiality of the presiding judge.
McMillan, 797 So.2d at 571. Surely, a fair reading of the trial court's response to the State's plea offer gives rise to a reasonable concern as to the "attitude of the judge and the atmosphere of the courtroom" in the subsequent proceedings leading to the imposition of the death penalty by the same judge.
NOTES
[1] The aggravating factors were: (1) the crime was committed in the course of a sexual battery; and (2) the crime was especially heinous, atrocious, or cruel (HAC).
[2] The mitigating factors were: (1) Mansfield exhibited good conduct during trial (accorded very little weight); (2) he was an alcoholic (accorded very little weight); (3) Mansfield had a poor upbringing and was from a dysfunctional family (accorded some weight); (4) his mother was an alcoholic (accorded very little weight); and (5) Mansfield suffered from brain injury due to alcoholism and a head trauma (accorded some weight).
[3] On direct appeal, Mansfield asserted: (1) his trial counsel was ineffective in failing to accurately communicate the State's plea offer after Mansfield was found guilty at trial; (2) the trial court erred in denying a motion to suppress statements made by Mansfield to detectives prior to his arrest; (3) the trial court erred in finding the HAC aggravator; (4) Mansfield's sentence of death is not proportionate; (5) the trial court erred in the way it weighted the mitigating factors; (6) the trial court erred in finding that there was no discovery violation in the State's failure to list demonstrative evidence introduced at trial; (7) the trial court erred in admitting the knife and sheath into evidence; (8) the trial court erred in admitting into evidence photographs of the victim's body; (9) the trial court erred in permitting the introduction of victim impact evidence; and (10) the trial court erred in rejecting Mansfield's specially requested jury instruction on the HAC aggravator.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The claims raised by Mansfield were: (1) Mansfield's trial counsel was ineffective for failing to present a theory of defense that would have led the jury to find him not guilty or guilty of a lesser offense; (2) his trial counsel was ineffective for failing to ensure that he was tried by an unbiased jury; (3) his trial counsel was ineffective for failing to properly cross-examine and impeach the State's key witnesses; (4) his trial counsel was ineffective for allowing defendant to waive his right to testify at the guilt phase hearing, when defendant wished to testify; (5) his trial counsel was ineffective for not moving to suppress all of the evidence that was illegally seized; (6) his trial counsel was ineffective for making an inadequate closing argument; (7) the State violated the decisions in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), when it failed to disclose exculpatory or impeaching evidence, failed to correct false and misleading testimony, and presented a false argument to the jury; (8) the trial court erred in instructing the jury on both felony murder and premeditated murder, when defendant had not been charged in the indictment with felony murder; (9) Mansfield's trial counsel was ineffective for failing to request a limiting instruction on certain victim impact evidence; (10) his trial counsel was ineffective because Mansfield's mental health mitigating evidence was not adequately presented at trial; (11) his trial counsel was ineffective because counsel failed to present all of the mitigating evidence; (12) his trial counsel was ineffective for not allowing Mansfield to testify during the penalty phase; (13) his trial counsel was ineffective in the handling of the State's plea offer; (14) his trial counsel was ineffective for failing to move for a disqualification of the trial judge; (15) Mansfield was denied a fair trial due to a cumulative effect of errors; and (16) Florida's death sentencing statute is unconstitutional.
[6] Because we find that none of Mansfield's other claims have merit, we reject Mansfield's cumulative-error argument. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003), cert. denied, ___ U.S. ___, 125 S.Ct. 413, 160 L.Ed.2d 328 (2004).
[7] A motion for disqualification must be filed within ten days following the discovery of the facts constituting the grounds for the motion. Fla. R. Jud. Admin. 2.160(e). Moreover, a motion for disqualification must be filed within thirty days after the movant learned of the alleged grounds for disqualification, "otherwise the ground, or grounds, of disqualification shall be taken and considered as waived." Rivera v. State, 717 So.2d 477, 481 n. 3 (Fla.1998) (quoting § 38.02, Fla. Stat. (1991)).
[8] Additionally, Mansfield contends that Judge Perry should have been recused because Judge Perry could have been required to be a witness at the postconviction hearing in respect to his statement.
[9] The eight jurors who Mansfield asserts his trial counsel should have more thoroughly questioned were Richard Best, Elaine Duffield, Eva Etheridge, Israel Santiago, Danny Hall, Kevin Hawkes, Shane Mathews, and William Henley.
[10] The facts underlying this claim will be more fully discussed and analyzed in the issue of this opinion concerning Mansfield's claim under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We do here point out that we do not find that Randall falsely testified about his federal charges or that either the State or defense counsel knew about the federal charges that form the basis of this claim.
[11] Flammia noted in her testimony that she was not sure if the federal hold that she was testifying to knowing about was the same federal hold to which postconviction counsel was referring. Whether or not trial counsel knew about the particular holds referenced in the note Randall received from the Osceola County Sheriff's Office on March 26, 1997, however, does not change our analysis because Mansfield has failed to demonstrate that Randall's testimony at trial was false.
[12] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[13] Mansfield admits that this third claim is not yet ripe for review, and so we do not address this claim.