972 So.2d 1056 (2008)
Claudychel LEYVA, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D05-1641.
District Court of Appeal of Florida, Third District.
January 23, 2008.
*1057 Rene A. Sotorrio, Coral Gables, for appellant.
Bill McCollum, Attorney General, and Maria T. Armas, Assistant Attorney General, for appellee.
Before GERSTEN, C.J., and SUAREZ and ROTHENBERG, JJ.
ROTHENBERG, Judge.
The defendant, Claudychel Leyva ("Leyva"), appeals his convictions for the first degree murder and aggravated child abuse of his girlfriend's two-year-old son, Marco Antonio Uti, Jr. ("Marco" or "the child"). As the evidence overwhelmingly supports the jury's verdict, and we find Leyva's arguments meritless, we affirm.
Leyva's arguments revolve around three major premises: (1) the indictment did not adequately put the defendant and the jury on notice as to the State's theory of prosecution; (2) the trial court erred in denying his motion to suppress his pre-trial statements; and (3) the trial court erred in denying his motions for mistrial.

FELONY MURDER
Leyva's first argument branches off into several sub-arguments. He claims that because Count I of the indictment does not include the elements of aggravated child abuse, it provided insufficient notice to charge and for the jury to convict him of first degree felony murder. Based upon this Leyva argues that the trial court erred in: (1) permitting the State to prosecute him for first degree felony murder; (2) denying his request to provide the jury with a special verdict form to reflect whether their verdict was based on premeditation or felony murder; and (3) denying his motion for judgment of acquittal because the evidence did not establish premeditation beyond a reasonable doubt. Because the premise upon which Leyva's arguments rest is flawed, so too are his arguments which flow therefrom.
The indictment charged Leyva as follows:
[Count I: First Degree Murder]
[T]hat between the 6th day of May, 2000, and the 7th day of May, 2000 . . . CLAUDYCHEL LEYVA did unlawfully and feloniously kill a human being, to wit: MARCO ANTONIO UTI, JR., from a premeditated design to effect the death of the person killed or any human being, or while engaged in the perpetration of, or in an attempt to perpetrate any aggravated child abuse, by beating the said MARCO ANTONIO UTI, JR., in violation of s. 782.04(1)(a) and s. 775.078, Florida Statutes. . . .
[Count II: Aggravated Child Abuse] [T]hat between the 6th day of May 2000, and the 7th day of May, 2000 . . . CLAUDYCHEL LEYVA did unlawfully, feloniously commit an aggravated battery upon and willfully torture and maliciously punish MARCO ANTONIO UTI, JR., a child of two (2) years of age, by beating and/or burning and/or biting MARCO ANTONIO UTI, JR., and during the commission of such felony, the defendant committed an aggravated battery, in violation of s. 827.03(1), Florida Statutes. . . .
(Emphasis added).
Leyva's claim of insufficient notice regarding the State's intent to prosecute him for felony murder is incomprehensible in this case. First, the State simply could have charged Leyva with first-degree premeditated murder and, without charging him in the alternative with first-degree felony murder, have proceeded on a felony murder theory of prosecution at trial. That is because the State is not required to provide the defendant with its theory of prosecution as to first-degree murder in the indictment. See Williams v. State, 967 So.2d 735, 758 (Fla.2007) ("[T]he State need not charge felony murder in an indictment *1058 . . . to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder.") (quoting Kearse v. State, 662 So.2d 677, 682 (Fla. 1995)); Hannon v. State, 941 So.2d 1109 (Fla.2006); Mansfield v. State, 911 So.2d 1160 (Fla.2005); Parker v. State, 904 So.2d 370, 382-83 (Fla.2005).
Second, although the State was not required to disclose its theory of prosecution for first-degree murder in the indictment, it did so in this case. The State charged Leyva with first-degree murder by premeditation and/or felony murder and put Leyva on notice that its felony murder prosecution would be based upon the underlying felony of aggravated child abuse. Additionally, in Count II, the State told him that it intended to prove the aggravated child abuse by proving that he committed an aggravated battery upon and willfully tortured and maliciously punished this two-year-old child by beating and/or burning and/or biting him while committing an aggravated battery upon him. The State, therefore, provided Leyva with more information than it was required to provide, and clearly put him on notice as to the charges he was facing.
Third, the extent of this child's injuries was undisputed at trial, as was the identity of the person who inflicted them. The following is a non-exhaustive summary of the child's injuries. Approximately fifty percent of Marco's body was burned from either hot liquids or a hot surface. The liquid burns were all over Marco's body, and the hot surface burns were found along his right arm, right knee, and along his inner thigh. His hair was burned off. There were blunt injuries to his head and face, with bruising around his eye, cheek, chin, neck, upper chest, and behind his left ear. There was a laceration in his scalp along his forehead and lacerations at the edge of his mouth and under his lip. The force of the head injuries dislodged Marco's teeth from their sockets. His jaw was broken, seven ribs were fractured, and his backbone was fractured. There was exsanguinated bleeding to his upper chest, right breast muscle, and into his belly cavity. His liver was severed, his lungs and heart were bruised, and his heart was lacerated. His pancreas was torn in half. His diaphragm was bruised and contused and there was bleeding around his esophagus. His spleen reflected a two-and-one-half inch laceration. Marco's skull was fractured in several locations, and his brain was torn. There were several lacerations, punctures, and linear abrasions on his penis. He had several human bite marks on his body.
Leyva's claim of insufficient notice of the charges is incomprehensible because: (1) the indictment charges Leyva with firstdegree felony murder and names the underlying felony as aggravated child abuse; (2) Count II explains that the aggravated child abuse is based upon the commission of an aggravated battery, willful torture, and malicious punishment of the child by beating, burning, and biting him; and (3) Leyva was aware of the nature and extent of Marco's injuries and admitted to inflicting them.[1]
We also reject Leyva's argument that the trial court reversibly erred in denying his request for a special verdict form containing interrogatories to indicate which theory of first-degree murder the State *1059 had proven beyond a reasonable doubt, because the jury could have been confused as to what the State needed to prove to convict Leyva of felony murder with aggravated child abuse as the underlying felony. The jury was properly instructed as to the elements of aggravated child abuse; the jury rejected Leyva's defense that the injuries were the result of his attempts to "revive an unresponsive child"; and the jury found Leyva guilty of aggravated child abuse. The evidence in this case was overwhelming that Marco died during the commission of, and as a result of, the aggravated child abuse.

THE MOTION TO SUPPRESS
Several officers responded to the house that Marco, Marco's mother, and Leyva lived in after receiving a 911 call from Leyva, who reported that the child had wandered off and was missing. Marco's mother was at work at the time. When a search of the apartment and the apartment building did not produce the child, the search expanded to the surrounding neighborhood and parked cars in the vicinity. Marco's body was eventually found in a dumpster, covered by a garbage bag containing a partially burned sweater belonging to Leyva.
Leyva and Marco's mother, who had been notified that her son was missing and had returned to the apartment, agreed to accompany the officers to the station to assist them with their investigation. Leyva was placed in an unlocked interview room. He was not handcuffed nor restrained as he waited to speak to Detective Sanchez. When Detective Sanchez entered the interview room and told Leyva that Marco had been found, Leyva told Detective Sanchez that he had not been truthful with the police, and that although he had told them that Marco disappeared while he was sleeping, what really occurred was that he had gone for a walk and when he returned he discovered that Marco was missing. Detective Sanchez did not attempt to interview Leyva.
Later that morning when Officer Martinez entered the interview room, Leyva, who had fallen asleep, awoke and spontaneously stated, "Ifed up my life. I shouldn't have done it." He then asked to speak to a detective. Officer Martinez relayed this information to Detective Zacharias, who responded to the interview room. When he entered the room, Leyva stated, "[L]ook, I really fed up now. I realize that but I got scared." Detective Zacharias gave Leyva his Miranda[2] warnings, and Leyva stated that he understood them and he agreed to speak to the detective. Leyva then admitted that he had lied about the child's disappearance because he did not know what to do; asked how many years he was going to get; and inquired whether he could post a bond. Leyva changed his story again and told Detective Zacharias that he had left the baby alone and when he returned he found him laying on his back with a dazed look, and that he tried to give him CPR with negative results. He admitted that he was responsible for Marco's injuries, but he claimed that they were inflicted after the child was already dead.
After, a recess, where Leyva was given lunch and used the restroom, he was readvised of his Miranda rights, and he provided a tape-recorded statement wherein he stated that he had left the baby in the bathtub and when he returned he found him lying face up with a dazed look on his face. When his attempt at CPR was unsuccessful, he panicked and began shaking, hitting, scratching, and biting the child to get a reaction. He wrapped the child in his sweater and layed him on the oven door to "get him warm." A neighbor *1060 came by looking for drugs. Leyva answered the door and when he returned, he found his sweater on fire. Leyva stated that he disposed of the child's body in the dumpster and began cleaning the apartment because there was blood everywhere.
At trial, Leyva admitted that he agreed to accompany the police to the police station and admitted that he agreed to speak to Detective Zacharias. Leyva testified that he initiated the interview with Detective Zacharias. Leyva also admitted that he was orally advised of his Miranda rights and that he also received his Miranda rights on a printed form, which he signed. Although Leyva claimed that when he was being advised of his rights he was not really paying attention, he testified that his lack of attention was irrelevant, as he wanted to tell Detective Zacharias what happened.
Although Leyva claimed that he was coerced by the police, who he claimed promised to release him if he provided them with a statement, the trial court found that this claim lacked credibility. In light of Leyva's admitted lies to the police and his admission at trial that it was he who initiated the interview with Detective Zacharias because he wanted to tell him what happened, we find no fault with the trial court's ruling denying Leyva's motion to suppress his statement.

CONCLUSION
Although we have not addressed all of the issues raised by Leyva in this appeal, we have carefully reviewed each, and we find that none have merit. Accordingly, we affirm the convictions and sentences imposed.
Affirmed.
NOTES
[1] Leyva's defense at trial was that the child was unresponsive and that the injuries were as a result of Leyva's attempts to "revive" him. The hot surface burns, he explained, were caused when he wrapped Marco up in his sweater and laid him on the oven door to "warm him," and left him momentarily while he answered the door (the visitor was a man seeking to purchase drugs). When he returned he found the sweater on fire.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).