931 So.2d 838 (2006)
Anthony LAMARCA, Appellant,
v.
STATE of Florida, Appellee.
Anthony Lamarca, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-1815, SC04-847.
Supreme Court of Florida.
April 20, 2006.
Rehearing Denied June 7, 2006.
*843 John W. Jennings, Capital Collateral Regional Counsel, Middle Region, Peter C. Cannon and Daphney Gaylord, Assistant CCR Counsels, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Anthony Lamarca appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the circuit court's order denying Lamarca's 3.851 motion and deny Lamarca's petition for a writ of habeas corpus.

FACTS
On November 6, 1997, Anthony Lamarca was convicted of first-degree murder for the death of his son-in-law, Kevin Flynn. He elected to represent himself during the penalty phase and waived the presentation of mitigating evidence. The jury recommended a sentence of death by a vote of eleven to one, and the trial judge sentenced him accordingly. This Court upheld that sentence on direct appeal. LaMarca v. State, 785 So.2d 1209 (Fla.), cert. denied, 534 U.S. 925, 122 S.Ct. 281, 151 L.Ed.2d 207 (2001). The following facts are relevant to Lamarca's 3.851 motion and habeas petition.
On December 2, 1995, Anthony Lamarca met his daughter and son-in-law, Tonya and Kevin Flynn, at a neighborhood bar. Lamarca had recently been released from prison for a 1984 conviction for kidnapping and attempted sexual battery with a weapon. See Lamarca v. State, 515 So.2d 309 (Fla. 3d DCA 1987). Lamarca asked Tonya to borrow the keys to her car, but Kevin refused and offered to drive Lamarca home instead. The two left the bar.
Later that night, Lamarca returned to the bar alone and told Tonya that she had to pick up Kevin at Joseph Lamarca's home. Joseph Lamarca is Anthony Lamarca's father. When they arrived at the otherwise unoccupied house, Lamarca *844 raped Tonya. He then appeared from a back room with a rifle in his hand and told Tonya that he was going to kill himself. He instructed her to stay put until she heard gunshots. After he left the room, Tonya fled to a nearby phone booth and reported that she heard shots being fired at a nearby residence. She gave the police Joseph Lamarca's address. When the police arrived at Joseph's house, they discovered that the front door looked as though it had been kicked in, and after obtaining Joseph's permission to search the residence, they found a rifle.
The police began searching for Anthony Lamarca. One detective arrived at Anthony Lamarca's trailer and spotted Kevin's body through a window. Upon entering the trailer, he found Kevin's body on the bedroom floor, bullet casings matching the rifle recovered from Joseph's residence, and blood splattered throughout the house. Lamarca was eventually arrested in Washington where he was living with Lori Galloway and her adult son, Darren Brown. Lori and Lamarca corresponded frequently while Lamarca was in prison, and they were married shortly after Lamarca's arrest for the murder of Kevin. The marriage ended before Lamarca's trial.
At trial, Brown testified on the State's behalf. He claimed that Lamarca arrived in Washington unannounced, carrying very few belongings. In addition, James Hughes, Lamarca's former fellow inmate, testified that Lamarca told him in July 1995 that Lamarca was planning to kill Lamarca's son-in-law because the son-in-law had raped Lamarca's daughter. Hughes had charges pending against him in Charlotte County at the time Lamarca's trial took place. Jeremy Smith also testified for the State, claiming that Lamarca arrived at Smith's home on the night of December 2, 1995, and said, "I did it. I killed him." Smith asked who he had killed, and Lamarca said, "Kevin ... it really sucked, but I had to do it." Smith testified that he lent Lamarca a shirt to wear that night, even though he and Lamarca were obviously different sizes. Smith testified further that he did not know whose shirt he gave Lamarca because "there were lots of clothes in the house." At the time Lamarca's case was being investigated, Smith was waiting to be sentenced for violating probation. After the evidence and arguments had been presented, the jury convicted Lamarca of first-degree murder.
At the penalty phase, Lamarca requested to represent himself and refused to present any mitigating evidence. The trial judge appointed Lamarca's penalty phase counsel as standby counsel. At the court's request, Lamarca's penalty phase counsel made a statement of the mitigation she would have presented if Lamarca had not waived his right to counsel and to present mitigation. This mitigation included, among other things, mental health mitigation from Dr. Glenn Caddy as well as testimony from Lori Galloway regarding Lamarca's positive characteristics and his kindness toward Lori and her children. Lamarca's penalty phase counsel stated that she also would have presented testimony from Lamarca's family members, but Lamarca was adamant that they not participate. The jury voted eleven to one to impose the death penalty, and the trial court agreed with this recommendation. The court found one aggravating factor, prior convictions for the violent felonies in 1984, and determined that the mitigating evidence did not outweigh this factor.[1] The trial court sentenced Lamarca to death.
*845 This sentence was upheld on direct appeal. LaMarca, 785 So.2d 1209.[2]
Lamarca's rule 3.851 amended motion for postconviction relief contained twenty-three claims.[3] The trial court considered *846 twenty-two claims during a five-day evidentiary hearing.[4] In an order dated September 12, 2003, the trial court denied all of Lamarca's claims. For the reasons explained below, we affirm the trial court's order and deny Lamarca's petition for writ of habeas corpus.

3.851 MOTION FOR POSTCONVICTION RELIEF
We begin by addressing Lamarca's claims for postconviction relief. When reviewing a motion for postconviction relief following an evidentiary hearing, this Court defers to the trial court's findings of fact as long as these findings are supported by competent, substantial evidence. Rodriguez v. State, 919 So.2d 1252, 1268-69 (Fla.2005). We affirm the trial court's denial of each claim. Lamarca has failed to overcome the strong presumption that his counsel rendered effective assistance as required by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Moreover, he has failed to establish either a Brady or a Giglio violation. Finally, his sentence is not unconstitutional, nor did the trial court abuse its discretion by allowing the prosecutor who represented the State in Lamarca's trial to conduct the evidentiary hearing. We address each of these claims below.

Ineffective Assistance of Counsel Claims
Most of the claims Lamarca raises in his postconviction motion allege ineffective assistance of counsel. Lamarca claims his trial counsel was ineffective for failing to contact Dr. Glenn Caddy to perform an additional psychological evaluation to determine if Lamarca was competent to represent himself in the penalty phase; failing to file a motion for continuance before trial; failing to file a motion to suppress the rifle seized from Joseph Lamarca's residence; failing to call key witnesses; failing to effectively cross-examine key state witnesses; failing to present mitigating evidence in the penalty phase; and failing to impeach Jeremy Smith with evidence of his prior misdemeanor. We affirm the trial court's denial of each claim.

Standard of Review
When considering claims of ineffective assistance of counsel, this Court applies the following standard:
An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below *847 an objective standard of reasonableness."
Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The prejudice prong of the analysis "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Failing to establish either prong results in a denial of the claim. Ferrell v. State, 918 So.2d 163, 170 (Fla.2005). When reviewing these claims, we defer to the trial court's findings of fact regarding the credibility of witnesses and the weight assigned to the evidence, but we review the performance and prejudice prongs de novo. Windom v. State, 886 So.2d 915, 921 (Fla.2004) (citing Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999)). Lamarca has failed to satisfy the Strickland standard in any of his claims.

Failure to Inquire into Lamarca's Competence
Lamarca claims that defense counsel was deficient for failing to order an additional psychological evaluation when Lamarca informed counsel that he planned to represent himself during the penalty phase. This claim rests largely on the testimony of Dr. Glenn Caddy, who testified at the evidentiary hearing that Lamarca became incompetent after hearing his daughter, Tonya Flynn, testify at trial that he raped her. Caddy testified that Tonya's testimony triggered Lamarca's posttraumatic stress disorder (PTSD) to the point that Lamarca became incompetent to represent himself, and Lamarca's act of banging his head against the glass during a meeting with his penalty phase counsel confirmed this.
In rejecting this claim, the trial court concluded that "the uncontroverted testimony of [Lamarca's defense attorneys] reflects that the defendant acted rationally, consulted them about his case, and was of sound mind prior to and during trial." This conclusion is supported by competent, substantial evidence, and Lamarca has not presented evidence sufficient to refute it.
Defense counsel investigated Lamarca's mental health status well before trial by hiring Dr. Michael Maher to conduct a psychological evaluation and by contacting Dr. Caddy numerous times before trial on Lamarca's behalf. At Lamarca's request, defense counsel arranged a meeting with Lamarca and Dr. Caddy before the penalty phase and followed up on this meeting with numerous phone calls. The trial court also found Lamarca competent to represent himself in the penalty phase after conducting a valid Faretta inquiry.[5]See Weaver v. State, 894 So.2d 178, 193 (Fla.2004) (recognizing that the focus of the Faretta inquiry is to determine whether the defendant is competent to waive his right to counsel, not whether a defendant is competent to conduct legal representation), cert. denied, 544 U.S. 1051, 125 S.Ct. 2297, 161 L.Ed.2d 1092 (2005).
Not only is the trial court's order supported by competent, substantial evidence, but the evidence Lamarca offers to refute it is also insufficient. The trial court's order states that Dr. Caddy was "not a particularly credible witness." This Court "recognize[s] and honor[s] the trial court's superior vantage point in assessing the credibility of witnesses." Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999), cited in Davis v. State, 915 So.2d 95, 130-31 (Fla.2005). Furthermore, the mere fact *848 that Lamarca banged his head against the glass is not sufficient to establish that his attorneys were ineffective for failing to request a mental health evaluation. In Koon v. Dugger, 619 So.2d 246, 250 (Fla. 1993), we denied an ineffectiveness claim based on defense counsel's decision not to require a mental health evaluation even though a defendant was "prone to courtroom outbursts." Because "nothing in the record suggest[ed] that [the defendant] lacked the ability to consult with his attorney or that he lacked a factual understanding of the proceeding against him," his counsel was not ineffective for failing to obtain an additional competency evaluation. Id. The same analysis applies here. The trial court's finding is supported by competent, substantial evidence; therefore, we affirm the trial court's order denying this claim. See Windom, 886 So.2d at 924-26 (rejecting ineffectiveness claim for failure to call mental health experts, in part because the record did not support the testimony of the experts who testified at the evidentiary hearing).

Failure to File a Motion for Continuance
Lamarca next claims that his attorneys were ineffective for failing to file a motion for continuance before trial. The trial court determined that the evidence Lamarca offered to show counsel was unprepared (i.e., two handwritten notes dated weeks before trial) was not "sufficient corroborative evidence" to outweigh defense counsel's credible testimony that each attorney was prepared for his or her respective phase of the trial. We affirm the trial court's denial of this claim.

Failure to File a Motion to Suppress
Lamarca also asserts that his counsel was deficient for not filing a motion to suppress the .22 caliber rifle seized from Joseph Lamarca's home. Lamarca's defense counsel testified that filing a motion to suppress would have been frivolous because Lamarca lacked standing to contest a search of his father's, i.e., Joseph Lamarca's, residence,[6] and Lamarca presented no evidence to rebut this. Defense counsel is not deficient for failing to abide by a defendant's request when the request violates an ethical rule. Lee v. State, 204 So.2d 245, 249 (Fla. 4th DCA 1967) (recognizing that an attorney's refusal to file a frivolous appeal at the defendant's request did not warrant relief in a postconviction proceeding). Therefore, this claim is without merit.
Moreover, the record establishes that defense counsel discussed the decision not to file the motion with Lamarca in advance, and Lamarca agreed with this decision. It is well established that "[s]trategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." Whitfield v. State, 923 So.2d 375, 381 (Fla.2005) (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). Therefore, Lamarca has failed to establish that his counsel was deficient for failing to file the motion to suppress.

Failure to Call Key Witnesses
Lamarca next argues that his counsel was ineffective for failing to call Lori Galloway, James Zaccagnino, Steven Slack, *849 and Suzanne Livingston to testify on Lamarca's behalf. Defense counsel testified that the decision not to present each of these witnesses was a tactical decision made well in advance of trial. This testimony was either uncontroverted or substantiated by other evidence. Therefore, the trial court properly denied this claim.
Defense counsel testified that he did not call Lori Galloway to testify because she had made inconsistent and highly incriminating statements to an investigator hired by the public defender's office, and these statements were substantiated by the investigator's report. We affirm the trial court's decision. See Marquard v. State, 850 So.2d 417, 427-29 (Fla.2002) (denying ineffective assistance claim for failing to call a witness when defense counsel reasonably feared the witness would implicate the defendant in the crime).
The decision not to call James Zaccagnino and Steven Slack to testify was likewise a reasonable strategy. At the evidentiary hearing, defense counsel testified that he chose not to call these witnesses because he did not believe either of them was credible. He believed Zaccagnino's hearing difficulties and significant prison record made him a poor witness. Furthermore, counsel thought the uncontroverted fact that Slack had been drinking when he spoke with Tonya and that Slack contradicted himself in statements made to law enforcement officers rendered him not credible. These facts were substantiated at the evidentiary hearing. This claim was properly denied. See Marquard, 850 So.2d at 428-29 (denying ineffective assistance claim for failing to call a witness when defense counsel did not find the witness credible).
Finally, defense counsel testified that his decision not to call Suzanne Livingston was strategic. Livingston, the Forensic Services Director for the Florida Department of Law Enforcement, performed DNA testing in regard to Tonya's sexual battery claim. The report Livingston filed contained some information that might have been useful in impeaching Tonya's claims of sexual battery, and Lamarca now alleges that defense counsel was deficient for not calling her to testify at trial.
At the evidentiary hearing, counsel testified that he did not call Livingston to testify because he did not want to open the door for the State to admit evidence that would have bolstered Tonya's testimony. Before the guilt phase, defense counsel had filed a pretrial motion in limine to prevent Tonya's testimony. The trial court ruled that Tonya's testimony would be admitted for the limited purpose of placing the murder weapon in Lamarca's possession. Defense counsel testified at the evidentiary hearing that he did not want to expand this limitation by admitting too much evidence impeaching Tonya's testimony. Moreover, if defense counsel had called Livingston to the stand, the State could have questioned her about other aspects of her report, which contained highly incriminating evidence supporting Tonya's claim. The trial court found that defense counsel knew the importance of Tonya's sexual battery claim to Lamarca's case. In his closing argument, counsel extensively argued the lack of DNA evidence supporting Tonya's testimony. Therefore, defense counsel was not deficient in failing to call an additional expert to confirm this.

Failure to Effectively Cross-Examine Key State Witnesses
Lamarca claims his counsel was ineffective in failing to effectively cross-examine Tonya Flynn and Darren Brown.[7] *850 As the trial court recognized, defense counsel's decision to limit the cross-examination of each of these witnesses was reasonable trial strategy.
Defense counsel testified that he strategically limited his cross-examination of Tonya and Darren in order to avoid opening the door to potentially incriminating information that would not otherwise have been admissible. As explained above, the admissibility of Tonya's testimony was limited to placing the murder weapon in Lamarca's possession. Strategically, defense counsel did not want to free the State from this limitation by impeaching Tonya's credibility and, thereby, allowing the State to introduce evidence to rehabilitate it. Instead, in his closing argument, defense counsel challenged the credibility of Tonya's testimony. As to Darren Brown, defense counsel limited his cross-examination because he feared an aggressive cross-examination would bring out Brown's earlier statement that Lamarca had confessed to killing Kevin.
We have long recognized that strategic decisions by trial counsel are "virtually unchallengeable." Downs v. State, 453 So.2d 1102, 1108 (Fla.1984); see also Davis v. State, 915 So.2d 95, 115 (Fla.2005) (recognizing that "counsel [i]s not ineffective in exercising his decision to discontinue further investigation into matters that were already known to him and that he had strategically determined should not be presented to the jury"), cert. dismissed, ___ U.S. ___, 126 S.Ct. 1649, 164 L.Ed.2d 357 (2006). The trial court's denial of this claim is affirmed.

Failure to Present Mitigating Evidence in the Penalty Phase
Lamarca claims that his attorneys were ineffective for failing to present evidence of mitigation in the penalty phase. This claim is without merit. First, Lamarca represented himself during the penalty phase; therefore, he cannot claim his trial counsel was deficient for decisions he made in conducting his defense during this phase. Second, as the trial court recognized, the "record is replete with references to [Lamarca's] decisions to waive mitigation" and "abundantly demonstrates that [Lamarca's penalty phase counsel] began preparing for the penalty phase many months prior to trial." Finally, even if this were not the case, the trial court followed the procedures required to ensure Lamarca knowingly waived his right to present mitigation.
In Koon, this Court recognized that defense counsel is not ineffective for honoring a criminal defendant's request that mitigating evidence not be presented in his case if counsel adequately investigated the potentially mitigating factors. 619 So.2d at 249-50. To ensure that counsel has adequately investigated mitigation, this Court requires defense counsel to "inform the court on the record of the defendant's decision [not to present mitigating evidence]," indicate whether counsel believes mitigating evidence exists and, if so, briefly describe that mitigating evidence to the court. Id. at 250. Then, the trial court must confirm with the defendant that his counsel discussed the matter of mitigation with him and that despite counsel's recommendation, the defendant wishes to waive *851 presentation of mitigating evidence in the penalty phase. Id. Even though the trial court accepted Lamarca's request to represent himself, it still followed these procedures. The trial court asked Lamarca's penalty phase counsel to proffer the mitigating evidence she would have presented on Lamarca's behalf, and her statement addressed the issues Lamarca now claims she was ineffective for not raising. The trial court required Lamarca to confirm his defense counsel's assertion that he did not want to present mitigation. Lamarca intelligently responded to the trial court's questions, reserving the right to cross-examine the State's witnesses and making it clear that he wanted to offer a closing statement. We affirm the trial court's denial of this claim.

Failure to Impeach Jeremy Smith with Evidence of Prior Misdemeanor
Lamarca fails to satisfy the prejudice prong of Strickland in his claim that defense counsel was ineffective for not impeaching Smith with evidence of Smith's prior conviction for a misdemeanor. The trial court found that Smith "was already impeached on the basis of his prior criminal history" because on direct, he testified to one felony conviction involving dishonesty. The fact that defense counsel failed to elicit an additional, lesser prior conviction does not require a finding of ineffective assistance. See Mansfield v. State, 911 So.2d 1160, 1174 (Fla.2005) (rejecting ineffectiveness claim based on failure to elicit federal charges pending against State's witness because the appellant failed to show how the outcome would have been different if the witness's full record had been known). Therefore, we affirm the trial court's denial of this claim.

Prosecutorial Misconduct Claims
Lamarca makes a number of allegations that the State violated Brady and Giglio.[8] We affirm the trial court's finding that Lamarca failed to establish either a Brady or a Giglio violation in regard to any of these claims. As we explain below, Lamarca did not establish that the prosecution suppressed either Lori or Zaccagnino's testimony. He also did not establish that the State put forth false testimony by presenting Brown, Hughes, and Smith as witnesses. Finally, the record does not support Lamarca's claims that the State made deals with either Smith or Hughes in exchange for their testimony.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a prosecutor's suppression of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment." To establish a Brady violation, a defendant must establish three elements: (1) the evidence at issue was favorable to the defendant, because it was either exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the suppression resulted in prejudice. Johnson v. State, 921 So.2d 490, 507 (Fla.2005). In Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court extended Brady to claims that a key state witness gave false testimony that was material to the trial. To *852 establish a claim under Giglio, a defendant must prove (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Suggs v. State, 923 So.2d 419, 426 (Fla.2005). When reviewing these claims on appeal, our standard of review is similar to that employed in ineffective assistance of counsel claims. We defer to the trial court's findings of fact but independently determine whether the facts are sufficient to establish the elements required in each claim. Id. We agree with the trial court that Lamarca failed to establish the elements required in either of these claims.
First, Lamarca failed to establish that the State suppressed either Lori's or Zaccagnino's testimony. The uncontroverted evidence presented at the evidentiary hearing establishes that defense counsel was aware of both witnesses' testimony. See Johnson, 921 So.2d at 507 ("The State cannot be said to have suppressed evidence that the defendant himself had knowledge of."). At the evidentiary hearing, Lamarca's penalty phase counsel testified that she was aware Lori had made statements contradicting Brown's testimony, but defense counsel chose not to call Lori to testify because she had made contradictory and incriminating statements to the defense investigator that could have been elicited on cross-examination. In addition, Lamarca's guilt phase counsel testified that he knew Zaccagnino would testify against Hughes; however, defense counsel did not find Zaccagnino credible enough to put on the stand. Therefore, Lamarca failed to establish the second prong of Brady in respect to these claims. See id.
Lamarca also failed to establish that either Brown, Hughes, or Smith testified falsely or that the State knew their testimony was false. Consequently, Lamarca has failed to establish either the first or the second prong of Giglio in regard to these claims. See Gorby v. State, 819 So.2d 664, 679 (Fla.2002) (denying Giglio claim because appellant failed to establish that the witness presented false testimony or that the State knew the witness's testimony was false). The fact that Lori's testimony at the evidentiary hearing contradicted Brown's testimony at trial does not establish that Brown's testimony was false. As the trial court recognized, Lori gave statements contradicting her testimony to the defense investigator before trial, and this earlier statement was consistent with other testimony presented at trial.[9] Similarly, the fact that Zaccagnino, a convicted felon and a close friend of Lamarca, contradicted Hughes' testimony is not sufficient to establish that Hughes' testimony was false, nor does the fact that Smith could not have lent his shirt to Lamarca contradict Smith's trial testimony that Smith lent a shirt to Lamarca. At trial, Smith was questioned about the fact that it would have been impossible for Lamarca to fit into Smith's clothing, and Smith responded that he did not know whose shirt he lent Lamarca because "there were lots of clothes in the house." We affirm the denial of these Giglio claims.
Finally, the record does not support Lamarca's claim that the State suppressed deals made with either Hughes or Smith in exchange for their testimony. The trial *853 court's order denying these claims is supported by competent, substantial evidence. While the record shows that the attorneys working on Hughes' and Smith's respective trials were aware that each defendant participated in Lamarca's trial, the record refutes Lamarca's allegations that either man's testimony in Lamarca's case resulted from a deal with the State. Because the record contradicts Lamarca's allegations that either man's testimony was part of a deal, we affirm the trial court's denial of this claim. See Mansfield, 911 So.2d at 1178 (denying Giglio claim alleging witness lied by testifying that he did not expect to receive any benefit from testifying because the "postconviction court found there was no evidence that [the witness] was promised any benefit in exchange for his testimony").
The trial court found no evidence that Hughes received a benefit for testifying in Lamarca's case, and this finding is supported by competent, substantial evidence. The assistant state attorney who prosecuted Hughes' case in Charlotte County at the time of Lamarca's trial testified at the evidentiary hearing that he never made a deal with anyone in Pinellas County. His handwritten notes indicate that he was aware Hughes was involved in a trial in Pinellas County but that he never spoke with anyone in Pinellas County about securing a deal. While Hughes did receive a downward departure, there is no evidence this sentence was promised to Hughes in advance or given in exchange for Hughes' testimony in Lamarca's case. In fact, the assistant state attorney assigned to Hughes' Charlotte County trial did not even participate in the negotiations regarding Hughes' ultimate sentence. He was instructed to adhere to the State's original offer, which was in accordance with the office's guidelines and not in accordance with any deal. At the evidentiary hearing, he testified that Hughes received a lesser sentence only after tough negotiations between a public defender who had a reputation for "mov[ing] cases" and an assistant state attorney with more authority than he to negotiate pleas.
In regard to Smith's trial, the record fails to establish that any benefit he received from testifying at Lamarca's trial came as the result of a deal. While the trial judge delayed Smith's sentencing hearing in order to allow Smith's defense counsel to put forth evidence that Smith was participating in Lamarca's trial, Lamarca failed to put forth any evidence establishing that this benefit was promised in advance or was part of a deal. At the evidentiary hearing, Smith's defense counsel at this sentencing hearing testified that the trial judge did not agree to lessen Smith's sentence based on evidence that Smith participated in Lamarca's trial. Moreover, the transcript from the sentencing hearing confirms this. While both an assistant state attorney and a state investigator assigned to Lamarca's case testified at Smith's sentencing hearing that Smith had cooperated in Lamarca's case, both also made it clear that their testimony at this hearing was not part of any deal. The assistant state attorney assigned to Lamarca's case specifically stated on the record at Smith's sentencing hearing, "There's no deal. No wink of the eye or anything with regard to Mr. Smith. He's here before Your Honor as a straight-up plea as far as we're concerned." Lamarca has not established that either Hughes' or Smith's testimony came as a result of a deal; therefore, we affirm the trial court's denial of this claim.

Unconstitutional Sentence
Lamarca claims that his death sentence is unconstitutional because it is based on a single aggravator. This claim *854 is procedurally barred because this Court addressed and rejected this claim on direct appeal when it determined that the death penalty was a proportionate sentence. LaMarca, 785 So.2d at 1216-17; see also Vining v. State, 827 So.2d 201, 213 (Fla. 2002) (finding defendant's claim that death sentence is unconstitutional was procedurally barred because it could have been raised on direct appeal). Therefore, we deny this claim.

Error in Allowing Prosecutor to Represent the State at Evidentiary Hearing
Finally, the trial court did not err in allowing the prosecutor who represented the State during Lamarca's trial to also represent the State at the evidentiary hearing even though the prosecutor knew he would be called as a witness at this hearing in regard to a Brady or Giglio claim. In Scott v. State, 717 So.2d 908, 910 (Fla.1998), this Court held that rule 4-3.7 of the Rules Regulating the Florida Bar does not prohibit an attorney from acting as both an attorney and a witness "where the state attorney was called as a witness for the other side on a Brady claim in a postconviction evidentiary hearing before a judge." Lamarca has not presented any evidence that the prosecutor went beyond what is authorized in Scott; therefore, we deny this claim.

PETITION FOR WRIT OF HABEAS CORPUS
Having denied Lamarca's claims for postconviction relief, we now address the four claims raised in his petition for writ of habeas corpus. In this petition, Lamarca claims his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); the trial court conducted an invalid inquiry under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); he was denied the right to participate in jury selection; and the trial court improperly dismissed certain jurors for cause. These claims are without merit; therefore, we deny relief.

Sentence Unconstitutional Under Ring

Lamarca's claim that his death sentence is unconstitutional because Florida's death penalty scheme violates Ring is without merit. Lamarca's death sentence became final when the United States Supreme Court denied his petition for writ of certiorari on October 1, 2001. This was before Ring was decided. Both the United States Supreme Court and this Court have held that Ring does not apply retroactively. See Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004); Johnson v. State, 904 So.2d 400 (Fla.2005).

Inadequate Faretta Inquiry
Lamarca's claim that the trial court erred in allowing him to represent himself during the penalty phase is also without merit. The trial court followed the requirements of Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), when deciding that Lamarca was competent to represent himself. The fact that Lamarca made an inappropriate or unwise statement to the jury does not negate the trial court's determination. The uncontroverted testimony at the postconviction hearing as well as the evidence presented at trial support the trial court's finding.
In Faretta, the United States Supreme Court recognized that "the Sixth Amendment grants to each criminal defendant the right of self-representation, regardless of consequences." State v. Bowen, 698 So.2d 248, 250 (Fla.1997). Nevertheless, because the consequences can be severe, trial courts are required to make the defendant *855 "aware of the dangers and disadvantages of self-representation, so that the record will establish that `[the defendant] knows what he is doing and that his choice is made with his eyes wide open.'" Hernandez-Alberto v. State, 889 So.2d 721, 729 (Fla.2004) (quoting Faretta, 422 U.S. at 835, 95 S.Ct. 2525). When the trial transcript reveals that the defendant is "literate, competent, and understanding" and has been apprised of his rights, this Court will uphold the inquiry. Smith v. State, 407 So.2d 894, 900 (Fla.1981) (quoting Faretta, 422 U.S. at 835, 95 S.Ct. 2525); see also Weaver v. State, 894 So.2d 178, 192 (Fla.2004) (recognizing that "[a] trial court may not impose counsel on a `literate, competent, and understanding' defendant who has voluntarily waived his right to counsel"). The penalty phase transcript reveals that these requirements were met in Lamarca's case. The trial judge informed Lamarca that he would be at a "great disadvantage" because he did not have the legal training of the state attorney, and on numerous occasions the judge expressed his disapproval of Lamarca's decision. The judge questioned Lamarca about his prior experience in the criminal justice system, recognizing that he had participated in two jury trials prior to this penalty phase, and the judge also considered Lamarca's mental condition, noting that his interactions with Lamarca during the many stages of trial indicated that Lamarca was intelligent and competent. In the end, the trial judge found that Lamarca was intelligent and that he had knowingly and voluntarily asserted his right to represent himself.
Moreover, Lamarca presented no competent evidence to refute this finding. The statement Lamarca relies on to assert his claim of incompetence was part of a concise, well-articulated speech in which Lamarca declared that the jury wrongly convicted him. The fact that this argument was not wise legal strategy in the penalty phase does not support Lamarca's claim that the Faretta inquiry was invalid. See Weaver, 894 So.2d at 193 (recognizing that the purpose behind the Faretta inquiry is to determine whether the defendant is competent to waive his right to counsel, "not whether [the defendant] is competent to provide an adequate defense").
Furthermore, Lamarca's competence was an issue in a number of claims raised at the evidentiary hearing upon postconviction review. None of the evidence presented at this hearing supports Lamarca's claim that he was incompetent or suicidal at trial. In fact, even Dr. Caddy, the expert who testified on Lamarca's behalf at the evidentiary hearing, contradicted Lamarca's assertion that he was suicidal. Dr. Caddy testified that Lamarca's PTSD and prior prison experience created in him a fierce instinct to protect himself and control the situation. He specifically stated: "Mr. Lamarca did not want to die. He didn't want to die then, and over the last number of years he hasn't wanted to die either, but he felt his only vehicle to assert his sense of strength and ego was to do something." Lamarca has not established that the trial court erred in allowing him to represent himself during the penalty phase.

Exclusion from Participating in Jury Selection
Lamarca also claims that his appellate counsel was ineffective for not challenging the dismissal of jurors for cause at a sidebar conference where Lamarca's counsel was present. To prevail on a claim of ineffective assistance of appellate counsel in a habeas petition, Lamarca must show (1) specific errors or omissions by appellate counsel that "constitute a serious error or substantial deficiency falling measurably outside the *856 range of professionally acceptable performance," and (2) that the "deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Dufour v. State, 905 So.2d 42, 70 (Fla.2005) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)). Appellate counsel cannot be declared ineffective for failing to raise a meritless claim. State v. Knight, 866 So.2d 1195, 1204 (Fla.2003).
Lamarca's claim is without merit because he has not established that his constitutional right to meaningfully participate in jury selection was violated. Jury selection in his case occurred on November 3, 1997, after the 1996 amendments to Florida Rule of Criminal Procedure 3.180(a)(4) took effect. See Amendments to Fla. Rules of Criminal Procedure, 685 So.2d 1253, 1254-55 (Fla.1996). These amendments recognize that when a defendant is physically present at a courtroom proceeding, his right to participate in a sidebar conference is satisfied if he is given a meaningful opportunity to participate through counsel. See id. at 1254 n. 2; see also Fla. R.Crim. P. 3.180(a)(4), (b).
The requirements of this rule were satisfied in Lamarca's case. The record reveals that Lamarca was physically present in the courtroom when the sidebar took place and that he was given the opportunity to meaningfully participate through his attorneys. The court began the sidebar by asking Lamarca's attorneys if Lamarca waived his right to be present at the sidebar. When counsel affirmed, the court gave both the State and the defense an opportunity to object to each juror the court suggested excusing, and after the sidebar ended, the court excused six jurors in open court. Neither Lamarca nor his trial counsel objected.
We recognize that before rule 3.180 was amended in 1996, this Court held that rule 3.180 granted criminal defendants the right to be "physically present at the immediate site where pretrial juror challenges are exercised." Coney v. State, 653 So.2d 1009, 1013 (Fla.1995). This holding, however, was superseded by the 1996 amendments that took effect January 1, 1997. See Amendments to the Fla. Rules of Criminal Procedure, 685 So.2d 1253, 1254 n. 2, 1255 (Fla.1996). Rule 3.180(b) now recognizes that when a defendant is physically present at a courtroom proceeding, his opportunity to meaningfully participate in this proceeding can be satisfied "through counsel." Because jury selection in Lamarca's case occurred after the amendments took effect, this language applies to his case. See Carmichael v. State, 715 So.2d 247, 248 n. 1 (Fla.1998) (recognizing Coney applies only to those cases where the jury selection occurred after Coney was issued and before the 1996 amendments took effect); see also Rincon v. Crosby, No. 803CV1138T17MAP, 2005 WL 1705472 *1, *5 (M.D.Fla. July 19, 2005) (denying habeas petition, in part, because Coney does not apply to a trial that occurred in 1998). Furthermore, even if Coney applied to Lamarca's case, Lamarca would still not be entitled to relief. Neither Lamarca nor his trial counsel timely objected to his absence at the sidebar; therefore, he has not established that his right to be present was violated. Neal v. State, 713 So.2d 1002, 1003 (Fla.1998) (denying defendant's claim that Coney entitled him to a new trial because neither "he [n]or his lawyer expressed any interest in [the defendant] being present at the bench" during jury challenges).
In summary, Lamarca's claim that his right to participate in jury selection was compromised by the sidebar is without merit; therefore, appellate counsel cannot be found ineffective for failing to raise this *857 on appeal. See Valle v. Moore, 837 So.2d 905, 907-08 (Fla.2002) (recognizing that appellate counsel cannot be deemed ineffective for failing to raise a meritless claim).

Invalid Cause Challenges
Lamarca's final claim is that his appellate counsel was ineffective for not challenging the trial court's decision to strike certain jurors for cause without explicitly providing the statutory basis for these cause challenges. Trial courts have broad discretion in deciding whether to strike a juror for cause. Busby v. State, 894 So.2d 88, 96 (Fla.2004) (requiring a trial court to excuse a juror for cause if any reasonable doubt exists regarding his ability to render an impartial recommendation as to punishment), cert. denied, ___ U.S. ___, 125 S.Ct. 2976, 162 L.Ed.2d 906 (2005); Davis v. State, 859 So.2d 465, 473 (Fla.2003) (quoting Fernandez v. State, 730 So.2d 277, 281 (Fla.1999), for the proposition that "[i]t is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error"). Lamarca has failed to establish that the trial court abused its discretion here. While the court did not indicate which provision of section 913.03, Florida Statutes (1997), justified its decision to strike each juror, the court allowed the State and defense counsel the opportunity to object to the dismissals. Moreover, even if Lamarca is correct that the judge improperly dismissed these jurors, Lamarca has not shown he was prejudiced by this decision. In fact, one of the jurors whom Lamarca now contests was excused at defense counsel's request. This claim is without merit.

CONCLUSION
For the reasons explained above, we affirm the trial court's order denying relief in Lamarca's motion for postconviction relief and deny the petition for writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The trial court recognized that Lamarca had knowingly and voluntarily waived his right to present mitigating evidence; yet, it still gave good-faith consideration to the mitigation in the record. It found (1) insufficient evidence that Lamarca was subject to extreme mental or emotional disturbances; (2) Lamarca's age of forty was not mitigating; (3) the circumstance that Lamarca was drinking and angry at his daughter on the day of the offense was unestablished; (4) insufficient evidence of Lamarca's work record; (5) Lamarca was generally well-behaved at trial, but this warranted very little weight; (6) Lamarca suffered from drug and alcohol abuse, as well as psychological problems, but this warranted very little weight.
[2] On direct appeal, this Court made a number of findings that are relevant to Lamarca's postconviction appeal. It rejected Lamarca's claim that the trial court abused its discretion by admitting evidence surrounding Lamarca's sexual conduct with his daughters. This Court found Tonya's testimony relevant to establish Lamarca's motive for killing Kevin (i.e., to have Tonya for himself). It also rejected Lamarca's claim that the trial court abused its discretion in refusing to consider proffered mitigating evidence. This Court found that "[p]roffered evidence is merely a representation of what evidence the defendant proposes to present and is not actual evidence. Because [Lamarca] waived the presentation of mitigating evidence, he cannot subsequently complain on appeal that the trial court erred in declining to find mitigating circumstances...." LaMarca, 785 So.2d at 1216 (citations omitted). Finally, this Court found that the death penalty was proportionate even though only one aggravating factor was present. This Court determined that the aggravator was significant, since it was based on a prior conviction for two violent felonies, and that there was no mitigation. This Court also found it significant that Lamarca committed this murder soon after being released from prison for his first two felonies.
[3] The motion filed by the Capital Collateral Regional Counsel (CCRC) presented twenty-three claims. Two of these were rejected at a case management conference held immediately before the May 29, 2003, evidentiary hearing, and one claim was added to these after this conference. Seventeen of these claims involve ineffective assistance of counsel. The CCRC claimed that defense counsel was ineffective for (1) failing to ascertain that the defendant was incompetent to proceed or psychologically unstable or both during both the guilt and penalty phase; (2) failing to move to suppress the .22 caliber rifle discovered at the residence of Lamarca's father; (3) failing to effectively cross-examine Tonya Flynn regarding inconsistent statements in regard to the events surrounding the sexual battery; (4) failing to move for a continuance when the attorneys knew they were unprepared for trial; (5) failing to take a second deposition of Tonya Flynn and Tina Lamarca; (6) failing to cross-examine Darren Brown; (7) failing to present Lori Galloway's testimony to rebut the State's argument that Lamarca's flight to Washington showed consciousness of guilt; (8) failing to present the testimony of James Zaccagnino; (9) failing to present the testimony of Steven Slack to rebut Tonya's testimony; (10) failing to effectively impeach Jeremy Smith with his prior conviction concerning dishonesty; (11) failing to effectively cross-examine the State's ballistics expert, Dominic J. Denio; (13) failing to effectively impeach Jeremy Smith on his drug use and not providing an expert witness to do this; (14) failing to present expert testimony to establish the significance of the lack of DNA evidence supporting Tonya's claims of sexual battery; (15) advising Philip Cohen, Lamarca's public defender in Pasco County, not to proceed against the charges of sexual battery even though the State's case was weak; (16) failing to obtain a brain scan to detect Lamarca's possible brain damage; (17) failing to adequately investigate evidence for mitigation; and (23) failing to effectively argue that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Claims (5), (11), (15), and (16) were not considered in the trial court's final order either because they were not supported by the record or because they were neither supported at the evidentiary hearing nor sufficient to merit relief as a matter of law. Two of these ineffective assistance claims, i.e., (7) and (8), include an allegation that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by knowingly presenting false testimony in regard to witnesses. Finally, six claims involve allegations other than ineffective assistance of counsel. These included: (12) Brady and Giglio violations for not disclosing Jeremy Smith's alleged deal with the State; (18) unconstitutional death sentence because only one aggravator is present; (19) unconstitutional death sentence because sole aggravator is prior violent felony involving the use of a knife, when the sentence on this prior violent felony was vacated because the jury never specifically found that the knife was used; (20) prosecutorial misconduct in the State's improper argument that a knife was used; (21) unconstitutional death sentence in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (22) that lethal injection constitutes cruel and unusual punishment. Claims (21) and (22) were orally denied at the case management conference held prior to the evidentiary hearing.
[4] The evidentiary hearing took place at two separate times. On May 29, 2003, the trial court conducted a four-day evidentiary hearing in which it heard most of the testimony regarding Lamarca's claims. On June 27, 2003, the court heard additional testimony. It issued its order on September 12, 2003.
[5] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[6] The Rules of Professional Conduct support defense counsel's position. Rule 4-3.1 of the Florida Rules of Professional Conduct prohibits an attorney from "bring[ing] or defend[ing] a proceeding, or assert[ing] or controvert[ing] an issue therein, unless there is a basis for doing so that is not frivolous." The comment following the rule defines a frivolous action, in part, as one in which the lawyer is "unable ... to make a good faith argument on the merits of the action taken."
[7] Lamarca also claimed his counsel was ineffective for failing to call the State's ballistics expert, Dominic Denio, to testify to the fact that gunpowder was evident only on the passenger's side door. Lamarca failed to support this claim at the evidentiary hearing, and the trial court appropriately dismissed it without further consideration. Even if Lamarca had raised it, it would have been without merit because defense counsel's decision not to call Denio was reasonable. The evidence presented at trial established that Tonya drove Lamarca to Joseph's home after Lamarca returned from shooting Kevin. The gunpowder on the passenger's side door, then, could have incriminated Lamarca.
[8] Lamarca's other claims of prosecutorial misconduct, i.e., that the prosecutor displayed photographs to the jury in violation of a court order and that the prosecutor improperly referred to the use of a knife in the commission of the offense for which Lamarca was previously convicted, are procedurally barred because they could have been raised on direct appeal. See Spencer v. State, 842 So.2d 52, 60-61(Fla.2003) (rejecting claims of prosecutorial misconduct because the basis for the claims was reflected in the trial record and, therefore, the claims should have been raised on direct appeal).
[9] Lori's earlier statement was that Lamarca was on the run. She later denied making this statement; however, it was contained in the defense investigator's report, which was included as an exhibit in the record. This statement was also consistent with Detective Kennedy's testimony that, within hours of the incident, he saw Lamarca walking shirtless along a road in Pasco County and that Lamarca ran when he saw the marked police vehicle.